## MOSES-ROSENTHAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14297.   Promulgated September 27, 1929.

*C. N. Goodwin, Esq.,* for the petitioner.
*G. S. Herr, Esq.,* for the respondent.

624

OPINION.

LITTLETON: The question is whether there existed such abnormalities with respect to capital or income for the fiscal year ended March 31, 1921, which would bring the petitioner within the provisions of section 327 of the Revenue Acts of 1918 and 1921, and therefore entitle the petitioner to have its tax computed as provided in section 328 of the same Acts.

The basic reason which petitioner assigns for the benefit of section 327 is a favorable contract arrangement which it had with a concern to whom it sold more than 90 per cent of the product which it manufactured. We can agree that with the limited borrowing capacity at petitioner's command it would not have been possible for the petitioner to have carried on the business done without the arrangement in question or something similar or equivalent which would have enabled it to have secured the materials for the larger volume of business which it undertook after the contract in question was effected, but we are unable to see that it necessarily follows that there was an abnormality in capital or income which would permit the application of the special assessment provisions. The substance of the arrangement seems to have been that Carson, Pirie, Scott & Co. furnished materials to the petitioner which were used by the latter in the manufacture of finished goods for sale to the former on something in the nature of a cost-plus basis. The materials in question which were purchased by Carson, Pirie, Scott & Co. could be used only in the manufacture of goods to be sold to that company, and Carson, Pirie, Scott & Co. were under obligation to take the finished product. Of course, if the petitioner had been required to buy the materials in the amount and at the time they were purchased by Carson, Pirie, Scott & Co., capital would have been required, but this is not the kind of a venture in which the petitioner was engaged. The materials were purchased for the account of Carson, Pirie, Scott & Co., and that company was responsible as to the payment therefor. That Carson, Pirie, Scott & Co. billed the goods to the petitioner at cost or market, whichever was lower, would not seem to be very material, for the reason that the petitioner billed the finished goods to Carson, Pirie, Scott & Co. on the basis of a normal profit on manufacturing. The contract was, of course, advantageous to the petitioner in the sense that it gave to the petitioner a supply of materials without an outlay of capital, and also gave to it an almost certain profit without the risk incident to the purchase of materials on its own account. But there is nothing to indicate that the transaction was not likewise advantageous and

desirable from the standpoint of Carson, Pirie, Scott & Co. The latter company desired the product which the petitioner had been manufacturing and by this arrangement or contract, it was enabled to insure, in a large measure, the necessary finished goods at what might be termed a maximum cost, taking the risk that there might be a drop in the price of the materials purchased. The credit arrangements between the two companies amounted to little more than that the petitioner would not ordinarily be called upon to pay for the piece goods prior to the time when it could expect payment for the finished product.

While the foregoing arrangement may be unusual as to the exact manner in which it was effected, and also unusual to the petitioner in that its business had heretofore been conducted in a different manner, it is not unusual for one concern to manufacture for, and supply to, another concern all, or a designated part of its output. And we think it would be going far beyond the intendment of Congress to say that, because the manufacturing concern was not required to lay out capital for the purchase of materials required in its operations, there is an abnormality as to capital in that there is capital being furnished from another source which is not recognized in the manufacturing concern's statutory invested capital. Not only was this unrecognized capital not that of the petitioner, but also it was not required by it in its operations as carried on. Nor was it in any sense borrowed capital, since Carson, Pirie, Scott & Co. were responsible for the payment for the goods and not the petitioner. The evidence does not indicate other than that the recognized capital of petitioner for invested capital purposes was a normal invested capital for a business carried on in this manner. The fact that the income was high on such an invested capital is not material. In *Enameled Metals Co.*, 14 B. T. A. 1392, where special assessment was denied in a case similar to the one now before us, the Board said:

The proximity of the petitioner's plant to that of Spang-Chalfant & Co. enabled it to secure its raw material upon very short notice, wherefore it was unnecessary for petitioner to carry any substantial inventory. It also purchased its supplies from Spang-Chalfant & Co. upon credit terms which enabled it to ship its finished product to its customers and receive the purchase price from them before it became liable to pay Spang-Chalfant & Co. The petitioner's witnesses estimate that if the petitioner had been situated farther from a source of supply of its raw materials and had been required to pay for its goods upon the usual credit terms, it would have required from $300,000 to $350,000 more capital. These favorable conditions may indicate good management and may have resulted in substantially larger income than could have been hoped for under less favorable conditions, but in our opinion they do not create abnormalities in either the capital or income. Section 327 of the Act expressly provides that it shall not apply to any case in which the tax is high

merely because the corporation earns a high rate of profit upon a normal invested capital. The record leads us to believe that this was the situation of the petitioner. No two businesses can be alike in all their factors. Each is bound to have certain favorable or unfavorable conditions as compared with others. It was not to such things as these that Congress had reference in the use of the word abnormalities in section 327, but rather to those situations where by reason of some peculiarity in the corporate structure, invested capital was unusually small as compared with the total capital employed in the business or income was affected by some unusual circumstance. *Pittsburgh Supply Co.,* 14 B. T. A. 620. Here none of such circumstances existed.

The further contention is made that special assessment should be allowed for the reason that the salaries paid the officers were low. One of the officers, who was also one of the two principal stockholders, testified that a reasonable salary for the two officers as to whom evidence was submitted would have been between $40,000 and $50,000. Their salary for the year before us was $22,000, and in addition they received commissions in the sale of goods amounting to $20,343.93, or a total of $42,343.93. The salary of the same two officers in the previous year was $16,500 which, when added to commissions paid to them in that year, made a total of salaries and commissions of $30,124.94. The schedule attached to the return and submitted in evidence states that the increases in salaries for 1921 over 1920 were made in accordance with added duties and responsibilities incident to the growth of the business. The evidence submitted as to salaries paid for similar services in the same industry is insufficient to show that the salaries paid to petitioner's officers were low as compared to those generally paid in the industry. Obviously, we are unable to say that grounds for the application of the special assessment provisions exist on account of such conditions. *Warren County Fertilizer Co.,* 17 B. T. A. 113.

Reviewed by the Board.

> *Judgment will be entered for the respondent.*

TRAMMELL dissents.